William J. Corbett  
vs.  Eq. No. 11659.
Lucinda C. Penhall,  
Exec. et als.

October 10, 1932.

CHURCHILL, J. Heard on demurrer and demurrer sustained on the ground that the complainant has not exhausted his legal remedy under the provisions of Section 52, Chapter 363, General Laws of 1923.

For complainant: William J. Brown.

For respondents: Atwood, Remington, Thomas & Levy.

Elizabeth R. Gallivan,  
Administratrix of the  
Estate of  
James Gallivan, Jr.  Eq. No. 6244.
vs.  
Thomas E. O'Donnell  
and  
John F. O'Donnell

October 15, 1932.

CHURCHILL, J. Heard on bill, answer and proof.

This is a bill in equity for an accounting, brought by the administratrix of the estate of James Gallivan, Jr., who in his lifetime was a member of the partnership of Gallivan & O'Donnell. Thomas E. O'Donnell and John F. O'Donnell were the liquidating partners of the firm.

The cause was referred to Alexander L. Churchill as a Master "to hear and report to this Court all evidence, and his rulings, findings, and recommendations." Numerous hearings were had before the Master and the reference was not completed at the time the Master was appointed as an associate justice of this Court. Thereafter, by stipulation, the reference was closed and it was agreed that the testimony and exhibits introduced and received by the Master "may be received before Mr. Justice Churchill * * * as if the same had been heard by him as a justice of the Superior Court." Further testimony was introduced before the Court after the entry of this stipulation.

James Gallivan, Jr., and Thomas E. O'Donnell entered into a partnership on March 10, 1894, for the purpose of carrying on a general insurance business. This partnership continued until March 31, 1919. On April 1, 1919, a new firm was organized made up of Messrs. Gallivan and O'Donnell and John F. O'Donnell. Under the articles of copartnership this partnership was to continue at the will of the partners but it was provided that any partner could withdraw from the co-partnership on giving three months' notice in writing.

Thomas E. O'Donnell gave notice on June 28, 1920, of his intention to withdraw from the partnership on September 30, 1920. The partnership was dissolved on that date. Thomas E. O'Donnell and John F. O'Donnell acted thereafter as liquidating partners.

A partial audit of the affairs of the partnership was made and transmitted

to James Gallivan, Jr., in September, 1920. He died on February 17, 1922. Elizabeth R. Gallivan was appointed administratrix of his estate. A final audit and account was made the administratrix on September 19, 1922, and the bill for an accounting was brought on March 13, 1923.

During the protracted hearings which took place on the reference, further accounts were filed, and in the hearings before the Court a large number of items in the accounts were challenged by the complainant, and the complainant has further requested special findings on certain of these items.

*I. Salary.*

During the years 1917, 1918 and 1919, Thomas E. O'Donnell received the amount of $9,600, which was entered on the partnership books as an expense. The origin of the item is this: From a date early in June, 1917, James Gallivan, Jr., did not take part in the affairs of the firm in any considerable degree owing to illness which incapacitated him from business to a certain extent. He was at the office occasionally and the record disclosed some insurance business written by him but not in any considerable volume.

John F. O'Donnell, who at that time was not a partner but who was employed by the firm, enlisted in the armed forces of the United States in May, 1917 and did not return until January, 1919. In addition, the working force of the office was depleted by the fact that two experienced clerks left its employ. Under these circumstances, an additional burden was thrust upon Thomas E. O'Donnell and to compensate him for such additional work, he drew a weekly salary of $100. This was entered upon the books as an expense. This salary account was not specifically brought to the attention of James Gallivan, Jr., until April, 1919, when the parties had somewhat prolonged negotiations in respect to a new partnership. At that time it was said

to Gallivan by Thomas E. O'Donnell that he had charged and withdrawn such a salary and to this no reply was made by Gallivan. In June, 1920, the subject was again brought up by Thomas E. O'Donnell and he was then told by Gallivan that it was "all right."

In view of the facts in the case, the Court is of the opinion, and so rules, that withdrawal as salary account of $9,600, while not originally authorized, was ratified by James Gallivan, Jr., and the objection thereto is overruled.

*II. Liquidating charge.*

An item of $6,272.37 appears in the account as a liquidating charge in favor of Thomas E. O'Donnell and John F. O'Donnell. They collected on accounts of the partnership the sum of $83,631.55 and charged 7½% thereof for their services as the liquidating partners.

The modern rule seems to be that while the Courts are disinclined to allow a liquidating partner to charge for his services, yet each case must be decided upon its particular circumstances rather than by an absolute rule.

*Thayer* vs. *Badger*, 177 Mass. 279.

(Opinion by Holmes, J.)

Dissolution had been discussed by Thomas E. O'Donnell in his conferences with James Gallivan, Jr., early in June, 1920. Gallivan had not been at the office to any extent or taken any active part in the affairs of the firm since June, 1917. On several matters of importance Thomas E. O'Donnell had insisted on some action being taken by Gallivan and notably in respect to an audit of the books and in regard to several accounts then due the firm. Nothing having been done by Gallivan, Thomas E. O'Donnell served a dissolution notice, and the firm was, in fact, dissolved on September 30, 1920. The liquidating period for which the charge was made was from September 30, 1920, to August 31, 1922. As far as the evidence discloses no objection was made to the partners, Thomas E. and

John F. O'Donnell, acting in this capacity. Soon after September 30, 1920, each of the parties, Thomas E. O'Donnell and James Gallivan, Jr., organized a separate corporation and each was interested and active in getting business for such corporations. On October 12, 1920, the Postmaster of Providence, R. I., at the instance of James Gallivan, Jr., refused to deliver mail addressed to the old firm of Gallivan & O'Donnell at its place of business. O'Donnell attempted to get the order rescinded and attempted to get Gallivan to withdraw his objection, but without avail. On January 23, 1926, the administratrix of the estate of James Gallivan, Jr., withdrew her objection.

Much of the business of the firm was conducted by mail and the result of the embargo placed on the delivery was that the liquidating partners were embarrassed in their efforts to collect the receivables of the firm and in other ways their work in this respect was made more onerous. There is no evidence that James Gallivan, Jr., took any active part in liquidating the affairs of the firm at any time before his death.

Under the facts in regard to the item of liquidating charge and the law applicable thereto, the Court is of the opinion that a liquidating charge was proper. The amount of $6,272.37 seems rather large. There is little evidence as to the time actually expended in the collection of the assets and the other work necessary in the winding up of the affairs of the defunct firm except the general statement that work was done and that a charge of 7½% was assumed by the liquidating partners to be reasonable.

A trust fund was being administered and if the general charge of 5% be taken as in accordance with the standard charge in this community for collecting trust income, a liquidating charge of $4,161.57 would seem to be reasonable. The item of $6,272.37 as a liquidating expense is stricken from the account and in lieu thereof the amount of $4,161.57 should be inserted.

III. *Commissions on additional premiums.*

This item, $2,650.43, is composed of additional premiums paid on policies of Workmen's Compensation Insurance written by the firm of Gallivan & O'Donnell previous to the dissolution. The premium on a Workmen's Compensation policy is based on the payroll of the assured during the life of the policy. At the time the policy is issued, an estimate of the pay-roll is made and the premium charged on this estimate. But this is not the final premium charge. Later an audit of the assured's books by the insurance carrier is made which discloses the actual pay-roll and the final premium charge is then finally determined.

In September, 1930, at a meeting of representatives of the companies involved, the agency of Gallivan & O'Donnell was terminated and cancelled for the respective companies. O'Donnell & Company, Incorporated, was appointed as the agent of each of the companies whose policies and premiums were involved. An audit of the pay-rolls of the assured disclosed that additional insurance was due, and the amount of $2,650.43 is the amount of commissions due on such additional premiums.

The respondents argue that the act of the companies in terminating the agency relationship cut off from the firm of Gallivan & O'Donnell any right to commissions based on such additional premiums, chiefly by reason of the fact that the company appointed in the place of Gallivan & O'Donnell had the duty of collecting such additional premiums from the assured. The respondents cite the rule that after termination of the agency, that insurance agent has no right in the absence of a special contract to renewals of

the policy originally written by him.

> *Gooding* vs. *Northwestern Mutual Life Ins. Co.*, 110 Me. 69, 85 Atl. 391;
> *Scott* vs. *Travelers' Insur. Co.*, 103 Md. 69; 63 Atl. 377.

The two cases are not sufficiently parallel to bring the case of an additional premium charge actually earned within the rule applied in these authorities. A policy of Workmen's Compensation Insurance written by an agent carries with it a premium on which the agent is entitled to a commission. This premium is estimated only at the outset, leaving the exact amount for future ascertainment. The fact that it is left uncertain at the outset cannot in the absence of special contract deprive the agent of his commission on the amount due. No contract has been introduced between the agency of Gallivan & O'Donnell and the companies involved which tends to show that the agent's right to commission on additional premiums on Workmen's Compensation policies has been extinguished or forfeited by cancellation. Under the circumstances disclosed by the evidence, the claim of Gallivan & O'Donnell was an asset of the partnership for which the liquidating partners are liable. Their account should be surcharged with the amount of $2.650.43 as income of the new partnership.

*IV. Return premiums on cancelled policies.*

The complainant urges (Request #8) that the respondents are chargeable with the amount of return premiums, $6,182.53, or the commissions thereon, $1,236.50, received on policies written during the life of the partnership and cancelled after dissolution.

The complainant did not file a brief with the Court or otherwise refer the Court to pages of the transcript or exhibits. The Court has been unable, in exploring the testimony, to find any such figures under this general subject matter.

Complainant's Exhibit 3 purports to be a tabulation of cancelled premiums, but this exhibit does not support the complainant's contention.

Moreover, it is in evidence by the complainant's auditor, Clegg, that in the case of a cancelled policy no return premium, in point of fact, would be paid to the firm and it would not constitute income.

The request is denied.

*V. Purchase of automobile.*

An automobile was purchased by the funds of the partnership on April 23, 1920. The purchase price was $3,950, and it was sold on September 30, 1922, for $3,100. The complainant objects to the charge of $850 in the account.

The circumstances attending the purchase were these: previous to April 23, 1920, both parties had personally owned automobiles and used such in the business of the firm. Thomas E. O'Donnell had, previous to 1920, bought a car of McCormick, chiefly at the insistence of McCormick who was a large customer of the firm. The automobile was purchased in April, 1920, was used about the affairs of the concern, and on the facts the Court finds that it was reasonably necessary in the conduct of the firm's business. James Gallivan, Jr., was not notified of the purchase and never used the car. It was kept in a garage belonging to Thomas E. O'Donnell. Taking into consideration the circumstances of the case and the character of the business carried on by Gallivan & O'Donnell, the Court finds that an automobile was necessary to carry on the business in the ordinary way and that it was beneficial to the partnership, and rules, therefore, that the purchase of the automobile was within the scope of the partnership and the authority of the party so purchasing.

> 1 Rowley's Modern Law of Partnership, Sec. 445.

*VI. Loans to John F. O'Donnell.*

It appeared in the testimony that the firm loaned to John F. O'Donnell

from February 2, 1917, to June 27, 1920, the sum of $42,629.62. John F. O'Donnell was an insurance broker and wrote a large volume of insurance through the firm. The loans were in the vast majority of instances repaid in a very short time, varying from one day to a week, the most notable exception being the loan of December 28, 1917, which was not repaid until August 8, 1918,. No interest was ever charged on the loans, Thomas E. O'Donnell testified in substance that it had been the habit of the partnership (that is, both the old and the new firm) to make such loans to John F. O'Donnell for a period of over twenty years. This testimony was not contradicted and disposes of the point raised that neither the firm nor the interest of James Gallivan, Jr., could be charged with the risk of loss of interest.

VII. *Issuing of notes by the firm.*

From time to time it was the practice of the firm to obtain bank loans on short time notes, usually thirty days. The complainant asks for a ruling (Request No. 5) that this was not authorized by the co-partnership articles. Article XI of the articles of co-partnership prohibits any co-partner from making any note without the consent of the other co-partner except in the usual and regular course of business and for the benefit of the co-partnership. The firm remitted to its insurance companies monthly and it would sometimes happen that the firm was temporarily without funds so to remit. In anticipation of the collection of premiums from the customers and to sustain the credit of the firm these bank loans were contracted. The practice was in the usual and regular course of business and was for the benefit of the partnership and the objection thereto is overruled.

VIII. *Bad debts charged off.*

The complainant requests a ruling (Request No. 13) that the bad debts charged off should be charged off against the partnership operating at the time the debts were so charged off. This is contrary to the articles of co-partnership. Article XV of the Articles of Co-partnership, entered into April 1, 1919, provides that "no credit given by the former co-partnership of Gallivan & O'Donnell and now charged on the books of said co-partnership shall be charged off as a bad debt against any earnings or income of this co-partnership made or earned after the first day of April, 1919." The total amount of bad debts of the old firm as charged off against the old co-partnership was $14,265.18. Of this $5,239.38 was charged off after April 1, 1919, but under Article XV this was a charge against the capital of the old firm.

The objection is overruled.

IX. *Bad Debts charged off against the new co-partners.*

This item consists of a bad debt charged off against John F. O'Donnell, a brother of Thomas E. O'Donnell, and the sum charged off amounts to $3,888.90.

John F. O'Donnell owed a somewhat large sum, was indebted to a local bank in a large amount, and on the testimony it clearly appears that he was insolvent. Thomas E. O'Donnell made inquiries and was convinced that no more than 40% would be obtained, consulted counsel in the matter, got an opinion from his counsel that such a settlement would be proper, and then settled the claim for forty cents on the dollar.

The respondent acted in good faith, on reasonable grounds and after diligent inquiry.

X. *Overages.*

The greater part of this item, $2,665.99, (Request No. 12), was made up of items on the books of the old co-partnership. Errors were made by a bookkeeper in the employ of the firm in transferring items from the ledger to the premium list. The partners

have had credit and the item should not go to income again.

Request No. 12 is denied.

XI. *Accounts receivable of the old partnership.*

On January 1, 1917, the accounts receivable of the old firm stood at $69,045.41. April 1, 1919, when the books of the new firm were set up, the journal entry of receivables read $78,536.77. In the first audit of the books of Gallivan & O'Donnell (Exhibit 4), the accounts receivable as of June 30, 1920, stood at $120,585.45. Accounts not collected since January 1, 1917, were included in the last figure of $120,585.45 and it was not deemed important by the respondents or their auditor to set up the figure of $69,045.41 until the complainant attempted to show that there was a large item of income not accounted for. Then the respondents searched for and set up the figure of $69,045.41 as the amount of accounts receivable on January 1, 1917. There was nothing in the transaction that reflects on the good faith of the respondents nor was there any attempt at concealment of the facts.

XII. *Withdrawals and interest.*

The complainant requests a ruling (Request No. 3) that Thomas E. O'Donnell was not entitled to withdraw in excess of the withdrawals of James Gallivan, Jr., and that the respondent Thomas E. O'Donnell be charged with interest on any such withdrawals.

After the date of dissolution Thomas E. O'Donnell withdrew from the funds of the partnership $15,000 in excess of the amount drawn by James Gallivan, Jr. Demand was made on the liquidating partner for "my share of said collections" on November 7, 1920, which was not complied with.

The first audit submitted by the liquidating partner on September 9, 1920, was not accepted by James Gallivan, Jr., and it was evident from his attitude that he was seriously challenging the accuracy of the audit and the good faith of the respondents. The audit of August 31, 1922, was likewise repudiated by the complainant.

The account of cash receipts and disbursements submitted by the respondent Thomas E. O'Donnell (Exhibit 13) discloses that beginning with February 1, 1921, Thomas E. O'Donnell withdrew $15,000 in excess of the amounts withdrawn by Gallivan. The statement likewise shows that the balance of cash after such excess distribution was, with the single exception of the withdrawal of February 1, 1921, more than sufficient to meet an equal withdrawal by and on behalf of James Gallivan, Jr., or in his interest.

On August 31, 1922, there was cash on hand amounting to $16,669.22 available as a fund from which the Gallivan interest could be paid. After the present bill in equity was begun, a motion was made by the complainant that the respondents be ordered to pay over to her the amount of the excess payments to Thomas E. O'Donnell. This motion was denied on the ground that because of the repudiation of the audits by the complainant or her predecessor in interest, she was not entitled to such payment (see Rescript filed April 7, 1923).

February 19, 1924, the amount of $17,200 in certificates of deposits was deposited in the registry of the Court by Gallivan & O'Donnell, and on March 20, 1924, $13,382.94 was withdrawn by the complainant.

For some time previous to the date of the notice of dissolution, June 28, 1920, the respondent Thomas E. O'Donnell had urged on James Gallivan, Jr., that an audit of the books of the concern be made, but without avail. The first audit made by the liquidating partners was in September, 1920.

The testimony is uncontradicted that from the time of dissolution onward the books of the firm were open to James Gallivan, Jr., and to his admin-

istratrix. The bill in equity was filed in February, 1923. The delay that has taken place in winding up the affairs of the partnership cannot be fairly attributed to the respondents.

The rule in respect to interest on a partner's share is laid down in *Smith* vs. *Smith*, 18 R. I. 722 at 726:

> "Ordinarily interest on the balance found due to a partner at the date of dissolution will be allowed from the date of dissolution or from such a date as would afford a reasonable opportunity to close up the partnership business."

The Court further said that all the services should be properly taken into consideration in passing on the matter of interest chargeable.

In view of the facts in this case, it would be inequitable to charge the liquidating partner with interest on $15,000 and the request that he be so charged is refused.

*XIII. Cash receipts and disbursements.*

The firm kept a simple series of books on a single entry cash basis. The audits which were made were made on the accrual basis. The audit as furnished did not take into account sums which went through the hands of the firm but which did not constitute either earnings or expenses. As an example: it was customary for the companies represented by the firm to pay losses by checks drawn to the order of Gallivan & O'Donnell, and Gallivan & O'Donnell in turn would then pay the assured such amount. The firm acted simply as a conduit in the transactions and neither its earnings or expenses were affected on either side of the ledger. Somewhat similar was the situation in respect to short time borrowings for temporary purposes. The loans were repaid and except for the matter of interest, the real income or earnings were not affected.

Very early in the hearings before the Master an attempt was made, by pro-longed cross-examination of the auditor called by the respondents, to show through him that a large amount of income was undisclosed and unaccounted for. By far the greater part of the time consumed in the reference was devoted to this purpose. The auditor testified that all the accounts receivable, the only source of real income, and all the expenses were accounted for. The complainant, after the reference was closed, produced in Court an accountant who gave it as his opinion, made up from an examination of incomplete data, that there was cash income of between $60,000 and $70,000 unaccounted for.

The auditor for the respondents then made a prolonged and exhaustive examination of the books of the concern and made up a statement entitled "Cash Reconciliations" (Exhibit 27). This report covered a period from January 1, 1917, to August 31, 1922. This report demonstrated that no such unaccounted for receipts or disbursements existed in point of fact. From January 1, 1917, to August 31, 1922, the total cash to be accounted for was $1,107,181.30, and there existed a net unaccounted for variation of $360.07. Of the total cash to be disbursed of $1,094,677.51, there was a variation of $573.40, and both variations were included in the account rendered.

*XIV. Cost of proceedings.*

A request is made (Request No. 10) that save for the expenses of the audits of September 9, 1920, and September 23, 1922, the additional expenses of the auditors and attorney, insofar as they are charged against the funds of the co-partnership, should be disallowed.

In none of the accounts actually put in evidence as exhibits do any such items appear which the complainant now requests the Court to disallow.

Respondents submitted for the guidance of the Court, with their brief, a schedule entitled "Summary of Operations and Distribution of Income Jan-

uary 1, 1917, to January 5, 1932." In this account, page 3, appears an item for professional services of Ward, Fisher & Company, $5,869.75. This was the accounting firm which made all of the audits and statements of the financial operations of the firm.

Upon the facts being brought to the attention of counsel, respondents offered in evidence the document, whereupon counsel for the complainant objected. It appearing that said statement included (a) a summary of other testimony and documents already in evidence, and (b) (page 3) a summary of operations and distribution of income from September 1, 1922, to January 5, 1932, the Court overruled the objection, noted an exception for the complainant and received the document as Respondents' Exhibit 28. This ruling is made without prejudice to the right of the complainant to object to the items appearing on page 3 of the exhibit and dated on or after September 1, 1922, excepting from this reservation of rights the ruling as requested in Request No. 10.

The charges for services rendered in the audits of 1920 and 1922 ($750), the complainant admits are proper. The further charge of $4,119.75 is not objected to as unreasonable at this time, but any charge of such character against the partnership funds is claimed to be improper.

On all of the evidence, the Court finds that the respondents acted in good faith throughout; that the liquidating partners carried on their duties in a diligent manner under the circumstances; that there was no concealment either of assets or books or other data, and that the books and documents of the firm were open to the other side either for the purpose of inspection or for an audit, and were, in fact, examined by an auditor employed by the complainant or her predecessor in interest, at least as early as 1923.

The books were kept on a single entry cash basis but the auditor, in making up his report, made it on a double entry accrual basis.

George B. Clegg, Jr., the accountant who examined the books of the firm for the complainant in 1923 or subsequent thereto, did not find any items not disclosed by the partnership account, and further stated that the audit, prepared for and submitted by the respondents, properly reflected the information contained in the books and records of the firm and that the original report was substantially correct.

The protracted attempt on the part of the complainant to prove a large shortage, before referred to in this rescript, made it necessary for the accounting party to make an investigation of over 20,000 items and to prepare numerous schedules and statements, some at the request of the Master himself.

This claim of a shortage was shown to be unfounded. The situation in regard to the excess of cash receipts and disbursements over receivables and expenses was clearly explained by the auditor early in the proceedings. The accountant employed by the complainant had examined both the books and the audits prior to the hearings before the Master and found that they truly reflected the business of the firm, as he afterwards testified.

The other items concerning which there was a dispute were disclosed on the face of the audit or were disclosed to the complainant without any concealment, such as the item of additional Workmen's Compensation premiums. Such items, by their nature, could not have been the subject of prolonged investigation or of a character to make extended hearings necessary, or to call for further and elaborate reports from an auditor. It would be an unwarranted burden to impose on the respondents the cost of the work necessary to refute the unfounded claim that a large shortage

existed. There is nothing on the facts to take the case out of the general rule that the partnership funds must bear the expenses of the audit and liquidation.

Request No. 10 is refused.

XV. *Charge of uncollected notes and accounts receivable.*

The complainant requests (Request No. 15) that the uncollected notes and accounts receivable at the end of the accounting period should be charged against the new partnership and not the old.

Article XVI of the articles of co-partnership of April 1, 1919, provided that after payment of the debts of the partnership the remaining property of the co-partnership "as it stands on the books of the co-partnership on the day of these articles (April 1, 1919) shall be divided equally between James Gallivan, Jr., and Thomas E. O'Donnell. If, however, the co-partnership * * * shall have augmented or increased after the first day of April, 1919, all such augmentation shall be divided equally between the co-partners, James Gallivan, Jr., Thomas E. O'Donnell and John F. O'Donnell."

At the time of the execution of the articles, all the parties being present, it was explained by counsel who drew the articles that, under Article XVI, "the amount of the assets of the old co-partnership would be the property of the old co-partnership and that doesn't make any difference in the distribution of the new, that it was the earnings of the new that was to be distributed."

This contemporaneous construction was acquiesced in by the partners.

The assets as they stood on the books of the new co-partnership, taken over from the old on April 1, 1919, consisted of furniture, fixtures, accounts, and notes receivable.

At dissolution, September 30, 1920, the assets consisted of furniture, fix-tures, accounts and notes receivable and cash.

The augmentation over the assets as they stood on April 1, 1919, for the period April 1, 1919, to September 30, 1920, was $7,509.53. This increase in net worth was divided equally between the three partners after deducting the charge for liquidation and the balance was divided between the two partners, Gallivan and O'Donnell, according to the method adopted by the accountant in the final liquidation of the firm. (Exhibit 6.)

The partners in the new firm had each a one-third interest in earnings. The old partners were to share between them the assets to the amount in which they stood on the books on April 1, 1919.

The request is denied.

Inasmuch as changes in the accounts rendered are made necessary under the rulings in sections II and III herein, and in order that the complainant may have opportunity to present objections to the supplementary account (Exhibit 28), subject to the ruling of the Court in Section XIV herein, the determination of the amount due the complainant and the final statement of the accounts rendered by the respondents are reserved for hearing on final decree.

For complainant: John P. Beagan.

For respondent: Comstock & Canning.